# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    v.

JAMES BROME,

        Defendant.

REPORT AND
RECOMMENDATION
11-CR-6089

_____

## Preliminary Statement

On May 12, 2011, defendant James Brome was indicted on one count of narcotics conspiracy. See Docket # 1. Before the Court are defendant James Brome's motions to suppress (i) fruits of Title III surveillance, (ii) physical evidence, and (iii) statements. (Docket # 81). The Government filed papers in opposition to defendant's motion. (Docket # 91). A suppression hearing was held on February 7, 2012, after which the Government and defense counsel both filed supplemental briefs. (Dockets ## 148, 152, 153). The following is my Report and Recommendation as to the defendant's suppression motions.[1]

## Findings of Fact

On September 12, 2010 at approximately 12:06 a.m., Lyons Police Department Officer P.J. Mastracy conducted a traffic stop of

_____

[1] By text Order of Judge Charles J. Siragusa, dated May 12, 2011, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). (Docket # 11).

a vehicle being operated by Ms. Jamie Beers.  Officer Mastracy testified that he pulled Beers's vehicle over because he observed her "cross over the double yellow solid line" on the road thereby committing a "Failure to keep right" in violation of New York Vehicle and Traffic Law Section 1120 Subdivision (a).  See April 17, 2012 Hearing Transcript (hereinafter "4/17/12 Tr.") (Docket # 143) at pp. 6-7.  Defendant James Brome was a front seat passenger in Beers's vehicle at the time of the traffic stop.  Officer Mastracy asked Ms. Beers to produce her driver's license.  Beers responded that she did not know where her license was but produced the vehicle's rental agreement which indicated that she was renting the vehicle that she was driving.  See 4/17/12 Tr. at pp. 10-11.

Officer Mastracy then inquired where Ms. Beers and defendant Brome had been that night and their answers aroused his suspicions. Specifically, Mastracy testified that Brome told him he had come from a friend who lived on "Smith Street" in Lyons.  When Mastracy told Brome there was no "Smith Street" in Lyons, Brome said they were coming from "Johnson Street."  Mastracy told Brome there was no "Johnson Street" in Lyons either and asked for the name of Brome's friend.  Brome told Mastracy that the friend he was visiting was "Ricky Crego."  Mastracy testified that he knew Ricky Crego and was aware that Crego was a convicted drug trafficker who was currently on parole.

Meanwhile, Beers had located her driver's license and gave it to Mastracy, along with Brome's photo identification card. Id. at p. 13.  Beers and Brome then informed Mastracy that they currently resided in Elmira and the Bronx respectively.  Id.  Mastracy told Beers and Brome to "sit tight" while he went back to his police car to run their identifications through his computer.  Id. at pp. 13-14.  Through running their identifications through his computer, Mastracy learned that Beers's license had been revoked and that Brome was currently on parole based on a felony level weapons conviction.  Id. at pp. 14-15.  Upon learning this information, Mastracy notified 911 of the individuals he had pulled over, and then called for police back up – namely Officer Minisce – to respond.  Id. at p. 15.  Mastracy testified that he called for backup because of "a couple of factors," including (i) he knew he would have to have the vehicle towed since there were no drivers with valid licenses in the vehicle, (ii) an inventory search of the vehicle would need to be conducted before it was towed, and (iii) safety concerns because the individuals had given untruthful answers regarding where they had come from that evening, he was unfamiliar with Beers and Brome, they were leaving the house of an individual (Ricky Crego) who was on parole and Brome was also a parolee out of New York City at a few minutes after midnight.  Id.

Officer Mastracy testified that shortly after calling for backup, he asked Beers to exit the car.  He told her that her license was revoked and invalid, that she was not under arrest but was "being detained."  Id. at pp. 15-17.  Mastracy pat-frisked Beers to ensure that she did not possess any weapons and then asked her to have a seat in the back of his police vehicle.  Id. at pp. 16-17.  Officer Minisce then arrived on the scene and Mastracy filled him in on the circumstances.  Then Mastracy and Minisce went to the passenger side of Beers's vehicle, asked Brome to step out of the vehicle, and Brome complied without objection.  Mastracy told Brome that Beers's license was revoked and that they were going to search the vehicle for "inventory purposes" and that they needed to conduct a "pat frisk" on him.  Id. at p. 17.  Mastracy testified that it was necessary to pat frisk Brome and place him in a police vehicle because he did not know Brome and "I need to place him someplace safe while I perform an inventory search of the vehicle... He's just going to have to be put in a safe place.  And the only safe place that's right there, in my opinion, is the back of a police vehicle."  Id. at p. 18.  As Brome stepped out of the vehicle, Mastracy observed "very large bulks" protruding from Brome's pockets.  Mastracy testified the bulks did not appear to be smooth.  Id. at pp. 19-20. Mastracy testified that at the time Brome stepped out of the car Mastracy was concerned that Brome was

-4-

"armed or dangerous" because (i) he did not know Brome "in any capacity," (ii) he had just "discovered that [Brome] was a parolee out of New York City for a felony weapons charge," (iii) Brome had given him untruthful answers about his whereabouts that evening, and (iv) Mastracy observed "extremely large bulks" in Brome's pants which Mastracy believed could be weapons.  Id. at p. 30.

Brome cooperated with the pat-frisk.  He exited the vehicle, turned around, placed his hands on the roof of the vehicle and spread his legs apart.  Mastracy testified that as he stepped in he "grabbed" the bulky object that was in Brome's right pocket. According to Mastracy, the object felt hard, even under Brome's sweat pants.  Brome then stated to Mastracy: "You're just going to pat me down, right?  You're not going in my pockets or nothing?" Id. at p. 20.  Mastracy testified that he could not tell what the hard bulky objects in his pockets were and therefore informed Brome that he needed to search Brome's pockets to ensure that he did not possess any weapons.  Id.  According Mastracy, Brome responded "Oh, okay."  Id.

Mastracy then reached into the pockets and removed large bundles of currency.  Mastracy asked Brome what he did for a living and Brome responded that he was a "delivery man."  Brome  told Mastracy that the amount of currency he had on him was "27."  Id. at p. 21.  Mastracy asked Brome if he meant $2,700.00 and Brome

responded "yeah." Id. Mastracy then advised Brome that he was not under arrest but was "going to be detained until the conclusion of the inventory search" of the vehicle. Id. at p. 23. Mastracy and Minisce then placed Brome un-handcuffed in the back of the police vehicle. Mastracy testified that there were three main reasons why Brome had to sit in the back of the police vehicle: (1) to ensure that he could not run away if the officers found something in the car that would require them to place him under arrest; (2) Brome's safety ("I don't want somebody [Brome] wandering around or getting hit by a car"); and (3) Officer Mastracy and Officer Minisce's safety. Id. at pp. 24-25. Mastracy testified that the doors to the police vehicle were shut and locked and neither Brome or Beers could have exited from the vehicle if they tried. Officer Mastracy could not remember if Brome ever asked if he could leave the scene, "[b]ut even if he did, I would have told him no." Id. at p. 39.

Mastracy testified that after securing Brome, Officers Mastracy and Minisce searched Beers's vehicle. Shortly thereafter, Officers Dresser and Sergeant Flock arrived and "took over the traffic stop," as they were Mastracy and Minisce's "bosses." Id. at pp. 48, 58-59. After Dresser and Flock arrived, Brome was placed in a separate police vehicle and was transported to the Wayne County Sheriff's Office.

-6-

## **Discussion**

I.  Motion to Suppress Evidence Obtained During Traffic Stop.

Brome seeks suppression of all physical evidence that was seized from him on September 12, 2010 on grounds that the stop of the vehicle was "unreasonable" and, as a result, the search and seizure of Brome's property was improper under the Fourth Amendment.  Based on established Supreme Court precedent and for the reasons set forth below, I disagree.

A.  The Stop of the Vehicle:  Officer Mastracy testified that he stopped Ms. Beers's vehicle because he observed her commit a traffic violation by crossing over a double yellow line on the road in violation of New York Vehicle and Traffic Law § 1120(a).  Based on the uncontradicted testimony adduced at the suppression hearing that Beers violated New York's Vehicle and Traffic Law, I find that Mastracy had a reasonable, articulable suspicion to justify a brief, investigatory stop of Beers's vehicle.  See Whren v. United States, 517 U.S. 806, 810 (1996)("[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

B.  Ordering Brome to Exit the Vehicle: The Supreme Court has repeatedly emphasized that traffic stops are "'especially fraught with danger to police officers.'"  Arizona v. Johnson, 555 U.S. 323, 330 (2009)(quoting Michigan v. Long, 463 U.S. 1032, 1047

(1983)).  See United States v. Robinson, 414 U.S. 218, 235 n.5 (1973)("[A] significant percentage of murders of police officers occurs when the officers are making traffic stops."). In Pennsylvania v. Mimms, 434 U.S. 106 (1977), the Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Id. at 111, n.6. In Maryland v. Wilson, 519 U.S. 408 (1997), the Supreme Court extended its Mimms holding to apply equally to passengers in cars subjected to legitimate traffic stops.  The Court stated that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Id. at 415. Thus, Officer Mastracy did not violate Brome's rights when ordering him out of the car pending completion of the stop.

C.  Pat Down Frisk of Brome: In Arizona v. Johnson, 555 U.S. 323 (2009), the Supreme Court held that to justify a pat-down of the passenger in a motor vehicle stopped for a traffic infraction "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." Id. at 327. I find that based on the totality of circumstances presented to Officer Mastracy, it was reasonable for him to believe that Brome could be armed and dangerous at the time he directed Brome to exit

the vehicle.

During the course of Mastracy's roadside encounter with Brome and Beers, he asked them questions.  Such questioning of Brome was proper.  "An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Id. at 333.  "[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification." Florida v. Bostick, 501 U.S. 429, 434-35 (1991)(citations omitted).  Here, the information Officer Mastracy received in response to his questions provided him with legitimate concerns about his safety.  Mastracy knew that Brome had lied about his  whereabouts that evening, had visited a friend who was a known drug trafficker on parole, was on parole himself for a weapons conviction, was far from the Bronx at a very late hour at night, and was traveling with an individual who was driving a rented vehicle with a revoked license.  In addition, as Brome exited the vehicle, Mastracy observed large bulky objects in the pockets of Brome's sweatpants.  All of this information provided Officer Mastracy with "reasonable suspicion" that Brome could have been armed and dangerous. Pennsylvania v. Mimms, 434 at 112

(presence of a noticeable bulge permitted officer to conclude that defendant was armed and therefore "posed a serious and present danger to the safety of the officer").  See United States v. Chaney, 584 F.3d 20, 26-27 (1st Cir. 2009)(bulge in pocket justified pat-down search of passenger); United States v. Hamilton, 978 F.2d 783, 785 (2d Cir. 1992)(where officers saw "unusual bulge" in pocket of passenger departing from bus, they were justified in fearing a weapon and conducting a pat down search).

D. Search of Brome's Pockets: Having determined Officer Mastracy was justified in conducting a pat down of Brome, the question next becomes was the scope of the protective frisk proper. The Second Circuit has acknowledged that "the infinite variety of situations in which a police officer may confront a suspect whom the officer reasonably fears is armed and dangerous" makes bright line rules on the intrusiveness of a frisk difficult to formulate. United States v. Casado, 303 F.3d 440, 448 (2d Cir. 2002). Generally, however, a search for weapons must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Terry v. Ohio, 392 U.S. 1, 29 (1968).  If a law enforcement agent conducts a protective weapons frisk and feels an object that he reasonably believes could be a weapon, he may seize it.  However, the limits of a Terry protective search are also well

established.   Indeed,  in  post-Terry  cases,  the  Supreme  Court  has
emphasized  that  a  protective  frisk  "is  not  to  discover  evidence  of
a  crime"  but  is  "strictly  limited"  to  ascertaining  whether  the
suspect  has  a  weapon  "which  might  be  used  to  harm  the  officer  or
others  nearby."   Minnesota  v.  Dickerson,  508  U.S.  366,  373
(1993)(citations  omitted).   As  to  whether  the  officer  conducting
the  Terry  frisk  may  seize  "nonthreatening  contraband  detected
during  a  protective  patdown,"  the  Supreme  Court  has  held  he  may  do
so  only  if  he  "pats  down  a  suspect's  outer  clothing  and  feels  an
object  whose  contour  or  mass  makes  its  identity  [as  contraband]
immediately  apparent."   Minnesota  v.  Dickerson,  508  U.S.  at  375
(police  officer's  continued  exploration  of  suspects  pocket  was
unrelated  to  purpose  of  a  Terry  weapons  frisk  and  therefore  seizure
of  cocaine  from  pocket  was  unlawful).   See,  e.g.,  United  States  v.
Ponce,  8  F.3d  989,  999  (5th  Cir.  1993)(removal  of  folded  dollar
bills  from  pocket  during  Terry  weapons  search  was  improper  because
the  officer  could  not  have  thought  they  were  a  weapon).

Applying  the  foregoing  constitutional  standards  to  the
evidence  adduced  at  the  suppression  hearing  is  somewhat
problematic.   Mastracy  never  testified  that  the  hard  bulks  felt
like  weapons  or  even  that  he  suspected  that  they  contained  weapons.
Indeed,  Mastracy  testified  that  before  commencing  the  frisk  he
"didn't  know  what"  the  bulks  were  (4/17/12  Tr.  at  p.  20)  and  after

the frisk conceded he "didn't have a clue" as to whether what he felt was a weapon or contained a weapon (id. at p. 40). And, as to whether the search of Brome's pockets could be justified as a search for "non-threatening contraband" under Dickerson, Mastracy testified that it did "not even cross my mind" that the bulks he felt were United States currency.  Id. at p. 41.

In the end, however, Officer Mastracy's subjective state of mind at the time he reached into Brome's pocket is not the relevant issue.  As now Chief Justice Roberts explained in United States v. Holmes, 385 F.3d 786, 790 (D.C. Cir. 2004), the fact that an officer "failed to testify that he thought the object was a weapon ... does not determine our inquiry."  Rather, "[t]he only relevant question is  whether a reasonable officer, knowing what [Officer Mastracy] knew at the moment of seizure, would have been justified in removing" what was in Brome's pockets.  Id.  See United States v. Rochin, 662 F.3d 1272, 1274 (10th Cir. 2011)("[B]ecause reasonableness remains the Amendment's touchstone, the constitutional inquiry turns on whether an objectively reasonable officer could have feared that the detected objects might be used as instruments of assault."); United States. v. Rahman, 189 F.3d 88, 120 (2d Cir. 1999)(objectively reasonable for the officers to suspect that a firm rectangular object felt during a frisk might be a weapon).

Here, Officer Mastracy was faced with (1) a late night encounter (2) with an out-of-town felon who (3) was on parole for a weapons conviction and who, as the pat frisk began (4) expressed concern that the officer might reach into his pockets and seize (5) large bulky objects that appeared to be "weighing his sweatpants down" (4/17/12 Tr. at p. 19). Officer Mastracy observed the bulky objects to be "very large" and, upon patting them down, testified that they felt "really, really hard." Id. at p. 40. Based on the totality of circumstances, I conclude it was objectively reasonable for an officer in Mastracy's situation to be concerned that inside the pockets were "concealed objects which might be used as instruments of assault." Sibron v. New York, 392 U.S. 40, 65 (1968)(emphasis added). At that point, Officer Mastracy was entitled to ensure his safety by searching Brome's pockets to determine whether the large hard objects he felt were dangerous to him or others. United States v. Rahman, 189 F.3d at 120 (objective test is whether "the facts available to the officer at the moment of the seizure or the search 'warrant [an officer] of reasonable caution in the belief' that the action taken was appropriate")(quoting Terry v. Ohio, 392 U.S. at 21-22)). But see United States v. Owens, No. 07-20568-CR, 2008 WL 151978, at *5 (S.D. Fla. Jan. 15, 2008)(Officer's "failure to state any reason for suspecting that the bulge in the defendant's pocket was a

-13-

weapon or contraband made the removal of the object impermissible under Terry."); United States v. Thornton, 493 F. Supp. 2d 1024, 1034 (S.D. Ohio 2007)(In the absence of "testimony that either the cellphones or the cash felt like a weapon" the government "failed to show that the frisking/searching officer stayed within the bounds marked by Terry.").

E. Brome's Statements: Brome seeks suppression of statements he made to Officer Mastracy regarding (1) what he did for a living, and (2) that he possessed "27" or $2,700.00 in currency.  These statements were made immediately after Brome was ordered to submit to a protective Terry frisk by Mastracy and the currency was pulled from his pockets.  According to Brome, his statements are inadmissible because they were the product of custodial interrogation and made without the benefit of Miranda warnings. See Def. Memo at p. 25.

It is well settled that "if the police take a suspect into custody and then ask him questions without informing him of [his Miranda] rights [], his responses cannot be introduced into evidence to establish his guilt." Berkemer v. McCarty, 468 U.S. 420, 429 (1984).  In Berkemer, the Supreme Court addressed the applicability of Miranda to questioning by law enforcement during traffic stops.  The Court stated that the non-threatening and non-coercive character of "ordinary traffic stops prompts us to hold

that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." <u>Id.</u> at 440. However, "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." <u>Id.</u>

The post-<u>Berkemer</u> intersection between <u>Miranda</u> and pat down searches conducted pursuant to <u>Terry v. Ohio</u> has often proven difficult for courts. <u>See</u> <u>Cruz v. Miller</u>, 255 F.3d 77, 84 (2001)(recognizing the "difficulty of determining 'custody' for purposes of <u>Miranda</u>" for someone whose seizure was based on <u>Terry</u>). Subjecting a stopped motorist to a <u>Terry</u> pat-down does not, by itself, amount to custody. <u>United State v. Newton</u>, 369 F.3d 659 (2d Cir. 2004). <u>See United States v. Robinson</u>, No. 04-CR-150A(F), 2005 WL 711623, at *5 (W.D.N.Y. Mar. 29, 2005)("When a seizure of a person remains at the stop and frisk inquiry level and does not constitute a restraint on his or her freedom of movement of the degree associated with a formal arrest, <u>Miranda</u> warnings need not be given prior to questioning."). In <u>Newton</u>, the Second Circuit noted that the Supreme Court in <u>Berkemer</u> identified the following:

> two factors as particularly relevant to determining
> whether a lawful investigatory stop involves restraints
> generally associated with a formal arrest. The first is
> whether a reasonable person in the suspect's shoes would
> have understood that his detention was not likely to be

> temporary and brief.  The second is whether a person
> stopped under the circumstances at issue would feel that
> he was completely at the mercy of the police.

396 F.3d at 675 (internal quotations and citations omitted).

Weighing these factors here, I conclude that Brome was not in custody for Miranda purposes when Officer Mastracy asked him about the currency pulled from his pockets.  First, the questioning occurred during a traffic stop on a public street, a fact that favors the Government's argument.  "[Q]uestioning incident to an ordinary traffic stop is quite different from stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." Berkemer, 468 at 438.  Second, the frisk and questioning occurred early in the encounter – Mastracy testified Brome was patted down "eight or nine minutes" after Beers's car was stopped.  The timing of the questioning suggests that Brome could not have thought he was being detained beyond what period of time a normal traffic stop would entail.  Third, Brome was never handcuffed, a form of restraint "generally recognized as a hallmark of a formal arrest." Newton, 369 F.3d at 676.  Fourth, there was not a large number of police officers on the scene at the time of the frisk and questioning and the officers that were present did not draw their weapons or advise Brome he was under arrest.  Finally, the fact that the questions

were asked <u>after</u> the money was seized from Brome's pockets did not transform the situation into a custodial encounter. This was not a situation where items found during a <u>Terry</u> frisk are so immediately incriminating that their very discovery would cause a reasonable person to believe they would not be free to leave. Here, Officer Mastracy found cell phones and United States currency in Brome's pockets, items that one might expect someone to be carrying on their person. <u>Cf.</u> <u>United States v. Alcantara</u>, No. 09 CR 231(NRB), 2009 WL 4756491, at *9 (S.D.N.Y. Dec. 2, 2009)(<u>Miranda</u> warnings required where officers discovered cocaine during a weapons pat-down following a traffic stop). For these reasons, <u>Miranda</u> warnings were not required prior to Brome being asked questions by Mastracy.

F. Conclusion: It is my Report and Recommendation that Brome's motion to suppress physical evidence and statements made during the September 12, 2010 encounter with law enforcement be denied.

<u>II. Motion to Suppress Evidence Seized Pursuant to Eavesdropping Warrant:</u> On October 29, 2010, Wayne County District Attorney Richard Healy filed an application for an eavesdropping warrant intended to intercept, overhear and record conversations made to and from cellular telephone number 347-835-3458 subscribed in the name of Chester Felid at 182 West 163 Street, Bronx, New York with

a Customer Identification Number 1053161309 with service provided by Cellco Partnership d/b/a Verizon Wireless over Tracfone Wireless L.P.  See Exhibit "A" attached to Docket # 81.  At that time, the Government had reason to believe that the cell phone was being used by defendant James Brome.  In the wiretap application, Healy averred that there was "probable cause to believe" that various serious narcotics crimes had been committed by James Brome and that the conspiracy to commit said crimes by James Brome was furthered by Brome's use of the cell phone with number 347-835-3458.  Id. Healy averred that "the crimes are being committed by" Brome "over Cellco Partnership D/B/A Verison Wireless, Tracfone Wireless LP cellular telephone number **(347) 835-3458**."  Id.  Healy stated that the cell phone was used by Brome "to receive and make telephone calls, which, once acted upon by the target, likely will result in the use of the telephone instrument to discuss the purchase, sale, possession and transportation of cocaine."  Id.  Healy believed that "the subject telephone is being used by [Brome] and others yet unknown, to call persons involved in the criminal sale, possession and transmittal of narcotics and related criminal conspiracies, and to further a criminal operation involving cocaine distribution." Id.

        In support of the eavesdropping warrant application was the affidavit of Wayne County Criminal Investigator/Deputy Sheriff

Sergeant Roger L. LaClair.  <u>See</u> Affidavit of Roger L. LaClair attached to Exhibit "A" annexed to Docket # 81.  In his affidavit, LaClair avers that based on his "training and experience" he is "familiar with the ways in which drug dealers conduct their drug-related business" including "methods of distributing cocaine" and "their drug proceeds," "use of telephone communications devices, digital display paging devices," "use of numeric codes and code words to identify themselves and to conduct their drug related transactions" and "the common practice of registering for and obtaining communication devices and assets under false names, or names of relatives and/or friends to avoid financial responsibilities and tracking of criminal activities by law enforcement entities."  <u>Id.</u>  LaClair stated that "[d]rug traffickers utilize certain technologies to facilitate their cocaine trafficking" including "[c]ellular telephones, direct connect point to point contact, voicemail and text messaging are frequently used because they afford a higher degree of mobility and the flexibility to return calls from locations where there are no phones."  <u>Id.</u>  LaClair further averred that "cocaine dealers believe that it is extremely difficult for law enforcement officers to wiretap cellular telephones" so "drug traffickers favor cellular telephones because of believed difficulties for law enforcement interception."  <u>Id.</u>

In his affidavit, LaClair outlined Brome's lengthy criminal history which included convictions for, *inter alia*, multiple drug offenses as well as "False Personation."   Id.   LaClair also detailed his investigation into Brome, including the purpose of the investigation which was to identify Brome's cocaine suppliers and those who aid him in the illegal possession, sale, distribution and storage of cocaine.   Id.   LaClair averred that starting in September 2010, police had been investigating Brome, Beers and Crego and that the investigation included intercepting calls pursuant to an eavesdropping warrant.   Through their investigation efforts they intercepted several calls between Crego and Brome which were "crypted" but which led officers to believe that they were engaged in illegal narcotics activity.   Throughout September and October 2010, police intercepted numerous calls between Brome and Crego and also surveilled Brome and Crego and observed them interact on several occasions.   Based on the conversations they overheard as well as the interactions they observed, LaClair avers that there was good cause to believe that Beers and Brome were being used to deliver cocaine to Crego and/or to pick up monies from Crego from cocaine sales.   For these reasons, LaClair averred in his October 29, 2010 eavesdropping warrant application that there was "probable cause to believe" that Brome utilizes cell phone number 347-835-3458 "in the furtherance of the illegal

possession and sale of cocaine, and conspiracy to commit those crimes." Id. On October 29, 2010, New York State Supreme Court Judge Dennis M. Kehoe issued an Order for an eavesdropping warrant for cellular telephone number 347-835-3458. See Order attached to Exhibit "A" annexed to Docket # 81.

Pursuant to 18 U.S.C. § 2518(10)(a), defendant Brome moves to suppress evidence obtained through the court-issued Title III intercept order. Specifically, Brome seeks to suppress all communications that were obtained from the wiretap of cellular telephone number (347)835-3458. He also seeks to suppress the conversations obtained from wiretap of cellular numbers where he was a party to the conversations. These telephone numbers include:

- (315)879-2723, utilized by Richard A. Crego (a.k.a. "Ricky Crego");

- (607)481-3616, utilized by defendant James Brome;

- (315)871-6055, utilized by Richard A. Crego; and

- (585)831-6273, utilized by Antonio Cobb.

Before turning to the merits of Brome's arguments, the Court reviews the applicable legal standards under the Fourth Amendment. First, search warrants may only be issued upon a showing of probable cause. "In determining whether probable cause for a search warrant exists, the issuing judicial officer is simply to make a practical common sense decision whether, given the 'totality

of the circumstances' set forth in the affidavit ... there is a
fair probability that contraband or evidence of a crime will be
found in a particular place." United States v. Barnes, 399 F.
Supp. 2d 169, 178 (W.D.N.Y. 2005)(citing Illinois v. Gates, 462
U.S. 213, 238-39 (1983)); see also United States v. Ponce, 947 F.2d
646, 650 (2d Cir. 1991). A "magistrate's finding of probable cause
is itself a substantial factor tending to uphold the validity of
this warrant." United States v. Travisano, 724 F.2d 341, 345 (2d
Cir. 1983); see also United States v. Ventresca, 380 U.S. 102, 106
(1965)(holding that a magistrate's disinterested finding of
probable cause based on reasonable inferences is given preference).
"The process does not deal with hard certainties, but with
probabilities." Gates, 462 U.S. at 230; see also United States v.
Thomas, 757 F.2d 1359, 1367 (2d Cir. 1985)("Probable cause to
believe certain items will be found in a specific location . . .
need not be based on direct, first-hand, or 'hard'
evidence.")(internal citation omitted).

Second, where a defendant challenges the accuracy of
representations in a warrant application, he must demonstrate by a
preponderance of the evidence "(1) that the inaccuracies were the
product of a Government agent's 'deliberate falsehood' or 'reckless
disregard for the truth' rather than innocent mistake, and (2)
that, after setting aside the falsehoods, what remains of the

warrant affidavit is insufficient to support a finding of probable cause." United States v. Coreas, 419 F.3d 151, 155 (2d Cir. 2005)(quoting Franks v. Delaware, 438 U.S. 154, 171-72 (1978)).

Here, defendant Brome maintains that a Franks issue exists due to "material misrepresentations" in the affidavit of Investigator LaClair which was submitted in support of the wire-tap application. See Docket # 159. Specifically, defendant asserts that the following four misrepresentations were made in LaClair's affidavit:

1.  When Brome was questioned by the Lyons Police regarding where the money came from he explained that "the money was given to him by his mother (later ID' as grandmother) to purchase a car."

2.  "Both Jamie M. Beers and James S. Brome gave consent" to search the vehicle.

3.  The Lyons Police found the money in a brown paper bag "in the back area of the vehicle" during their search of the vehicle.

4.  LaClair averred that it was his "belief" that defendant "Brome delivered a quantity of cocaine in exchange for the money that was located in the vehicle during the stop." Defendant asserts that this statement is "misleading because there is no good faith basis" and is a possible misrepresentation because the money was in

fact not found in the "back area of the vehicle."
See id.; see also Affidavit of Roger L. LaClair attached to Exhibit
"A" annexed to Docket # 81.  Defendant argues that these
misrepresentations are "material" and, as a result, the recordings
obtained through the wire tap application should be suppressed and,
at the very least, a Franks hearing should be held "to further
explore" these issues.  Id.

In response, the Government "concedes that there are two
erroneous statements in LaClair's affidavit," namely Numbers 2 and
3 set forth above.  See Docket # 161 at p.2.  The Government
asserts that these erroneous statements "are minor" and "were not
knowingly and intentionally made falsely, or with reckless
disregard for their truth" and "neither statement is material
within the meaning of Franks."  Id.  The Government maintains that
"neither statement is relevant, let alone necessary, to a
determination that probable cause existed that the eavesdropping
order would yield evidence of the drug crimes being investigated."
Id.  I agree.

With respect to the two statements which the Government
concedes were erroneous, Brome has not established that these
inaccuracies were the product of a Government agent's "deliberate
falsehood" or "reckless disregard for the truth."  See Franks v.
Delaware, 438 U.S. 154, 171-72 (1978).  Moreover, even if these

-24-

erroneous statements are set aside, I find that the remainder of the information set forth in the warrant application was more than sufficient to support a finding of probable cause.  See United States v. Coreas, 419 F.3d at 155.

With respect to alleged erroneous statement Number 1 – *i.e.*, LaClair's statement that Brome stated that "the money was given to him by his mother (later ID' as grandmother) to purchase a car" – I find that Brome did not establish that said statement is in fact false.  Brome argues that it is false because Officer Mastracy testified at the April 17, 2012 suppression hearing that Brome did not make that statement to him at the scene.  See April 17, 2012 Hearing Transcript (hereinafter "4/17/12 Tr.") at p. 51.  Officer Mastracy testified, however, that "later on that night [] after Brome went to the Wayne County Sheriff's Office" Mastracy spoke with Officer Dresser and/or Sergeant Flock and "[t]hey had told me ... that he had said he got the money from his grandmother."  Id. at p. 53.  Thus, the statement is not necessarily false, it simply was not made to Officer Mastracy.  The Government points out that LaClair's affidavit does not specify the location where that statement was made, to whom the statement was made or who was present when it was made.  See Docket # 161 at p. 3.  Officer Minisce was also present at the scene and had interactions with Brome that night and it is possible that Brome made that statement

to Minisce.

With respect to alleged "misleading" statement Number 4 – *i.e.*, that it was LaClair's "belief" that defendant "Brome delivered a quantity of cocaine in exchange for the money that was located in the vehicle during the stop" – I do not find that this is a misleading statement or that it was made without a "good faith basis" as defendant claims.  LaClair, an experienced criminal investigator, based the beliefs set forth in his affidavit on his "training and experience" and upon the ongoing criminal investigation of defendant Brome.  Based on his training and experience and the information he had through law enforcement's investigation of Brome, LaClair did not believe Brome's explanation of where the money came from.  I do not find LaClair's statement regarding where he believed the money actually came from to be misleading.

In sum, although the LaClair affidavit contained two erroneous statements, I do not find that the erroneous statements  were the product of a Government agent's "deliberate falsehood" or "reckless disregard for the truth."  See Franks v. Delaware, 438 U.S. 154, 171–72 (1978).  Moreover, these erroneous statements were not "material" nor necessary for the issuing judge – Judge Dennis M. Kehoe – to determine that probable cause existed.  Even without the erroneous statements, Investigator LaClair's affidavit contained

sufficient information for Judge Kehoe to conclude that the eavesdropping Order would yield evidence of the drug trafficking crimes alleged. Accordingly, I conclude that defendant is not entitled to a <u>Franks</u> hearing.

Turning to the merits of defendant's motion for suppression, defendant moves on grounds that in the application for the eavesdropping warrant the Government made "an insufficient showing that other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or that they would be too dangerous to attempt" and, therefore, "the communications obtained must be suppressed." <u>See</u> Defendant's Memorandum of Law (hereinafter "Def. Memo") annexed to Docket # 81 at p. 9. Brome argues that the wire tap warrant should not have been authorized because the application submitted in support of the warrant contained insufficient information to demonstrate that traditional investigative procedures had been exhausted or otherwise adequately considered. Specifically, Brome asserts that (i) confidential sources were used during the investigation and this technique was "successful"; (ii) undercover officers could have assisted in achieving the goals of the investigation and there is no reason or explanation "setting forth why an introduction for an undercover law enforcement officer would have been unsuccessful or impractical"; (iii) ordinary surveillance methods had "been

successful in obtaining information regarding the drug transactions" and "[t]he success of surveillance actually belies the [] opinion that surveillance would not succeed"; (iv) search warrants had been "successful" and "evidence was collected as a result" of the successful search warrants which "belies" the statement that search warrants were "unlikely" to result in obtaining evidence of narcotics trafficking; (v) interviews could have been used to gather information regarding law enforcement's investigation and there is no reason why Mr. Crego "could not be interviewed in connection with this investigation, thus necessitating a wiretap order" and there is evidence that law enforcement had previously conducted interviews of Mr. Crego which were "successful"; (vi) toll records were not obtained or analyzed; and (vii) a grand jury investigation was inappropriately rejected as likely unsuccessful.  See Def. Memo at pp. 9-14.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 allows for wiretaps in limited circumstances.  See 18 U.S.C. § 2510 et seq.  Under § 2518, in order to lawfully conduct wiretap surveillance, the government's application must set forth "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  See 18 U.S.C. § 2518(1)(c).  The purpose of this requirement "is to strike

-28-

a balance between citizens' privacy rights and the needs of law enforcement by ensuring that wiretapping is not used when traditional investigative techniques would suffice." United States v. Vasconcellos, Cr. No. 1:07-CR-226, 2009 WL 3152468, at *20 (N.D.N.Y. Sept. 29, 2009)(mem.).

In United States v. Concepcion, 579 F.3d 214 (2009), the Second Circuit reviewed the standard courts should utilize in determining whether the government has met the exhaustion requirement.  While emphasizing that generalized and conclusory statements are insufficient, the court also held that "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance."  Id. at 218.  The court stated courts deciding whether to issue wiretaps should apply a "commonsense approach" especially in "complex and sprawling criminal cases involving large conspiracies."  Id.

Applying a commonsense approach to the wiretap at issue here yields a conclusion that the motion to suppress should be denied. Brome complains that investigative techniques less intrusive than electronic eavesdropping could have been successfully used by law enforcement and that the exhaustion requirement requires a showing "that other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or that they would be too dangerous to attempt."  See Def. Memo at p.

9. Defendant argues that here no such showing was made. However, "[n]either the New York nor the federal statute requires that any particular investigative procedures be exhausted before a wiretap may be authorized. Wiretaps are neither a routine initial step nor an absolute last resort." United States. v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983)(citation and quotations omitted); see United States v. Terry, 702 F.2d 299, 310 (2d Cir. 1983)("An affidavit describing the standard techniques that have been tried and facts demonstrating why they are no longer effective is sufficient to support an eavesdropping order even if every other possible means of investigation has not been exhausted."); United States v. Funderburk, 492 F. Supp. 2d 223, 242 (W.D.N.Y. 2007)("The purpose of this requirement is not to render electronic surveillance an investigative tool of last resort, but to apprise the judicial officer of the progress of the investigation and the difficulties inherent in the use of normal investigative techniques.").

The affidavits submitted in support of the wiretap application at issue here were adequate. They described an investigation in 2010 involving an illegal narcotics conspiracy in which several undercover drug purchases were made by confidential sources from defendant Brome. Moreover, co-defendant Patrick Flank revealed that a "New York City guy" delivered cocaine at least fifteen times during the prior two months in exchange for money and there was

-30-

reason to believe that the "New York City guy" was defendant Brome. On September 10, 2010, Judge Kehoe signed an Order for an eavesdropping warrant for telephone number (315)530-3371, which at the time was being utilized by Richard Crego, and the fruits of that wiretap led law enforcement to evidence supporting a drug distribution network which included defendant Brome. Based on the fruits of that wiretap, law enforcement applied for a wiretap for another one of Richard Crego's telephones, namely telephone number (315)871-6055, and on October 4, 2010, Judge Kehoe signed an Order for said wiretap.

The application for the wire tap of defendant Brome's cellular telephone number (347)835-3458 built on the results of the preceding wiretap applications. I have reviewed the affidavits submitted by Richard Healy and Roger LaClair in support of the wiretap. In each, the affiant discussed that normal investigative techniques have been tried and failed or are unlikely to succeed or are too dangerous to attempt in obtaining sufficient information and evidence to allow law enforcement to obtain the goals of their investigation. The LaClair affidavit sets forth specific details regarding the utility and use of normal investigative techniques, including the use of confidential sources or undercover officers, physical surveillance, search warrants, interviews, toll analysis data and a Grand Jury investigation. LaClair asserted that these

methods only provided a limited picture of the drug distribution network, and noted that the investigation has shown that the members of the conspiracy regularly use their cellular telephones to further the goals of their drug trafficking activities. "[W]iretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975), cert. denied, 425 U.S. 971 (1976).

In sum, viewing the affidavits submitted in support of the wiretap applications in a commonsense fashion reveals a large scale narcotics trafficking operation which could not be adequately investigated by traditional methods. Giving appropriate deference to Judge Kehoe's review and acceptance of the affidavits in support of the application for the warrants, I conclude that Judge Kehoe properly found that the application adequately addressed the exhaustion requirement found in § 2518. Accordingly, it is my Report and Recommendation that defendant's motion to suppress the evidence obtained through the various court-issued Title III intercept orders be denied.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motion to suppress the fruits of Title III surveillance (Docket # 81) be **denied**, motion to suppress physical

evidence (Docket # 81) be **denied,** and motion to suppress statements

(Docket # 81) be **denied.**

**SO ORDERED.**

_____
        JONATHAN W. FELDMAN
    United States Magistrate Judge

Dated: September 5, 2012
        Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[2]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated:      September 5, 2012
            Rochester, New York

---

[2] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  United States v. Andress, 943 F.2d 622 (6th Cir. 1991); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).